Good morning, and welcome to the Eleventh Circuit. This is our last day of oral arguments this week, and we have four cases on the calendar. So we'll begin right away. Just a housekeeping note about our timing clock. If you're not familiar, the light will be green until you have two minutes remaining in your allotted time. Then it will turn yellow. And when it turns red, we ask you to very quickly conclude your remarks, unless you're in the process of answering a question from the court. Our first case is number 23-12155, August Dekker v. Florida Agency for Health Care Administration. Mr. Gisele, you've reserved two minutes for rebuttal, is that correct? Three minutes, I'm sorry. Yes, misread that. Could you raise your microphone just a little bit? I'm having trouble hearing you. There you go. Your Honor, as I said before, the issue is whether or not the State of Florida can choose not to reimburse the service, specific to the medical diagnosis. And we believe the answer is yes, because the State's exclusion applies to anyone and everyone, regardless of sex, gender identity, or a combination of those things. And the State's medical policy choice is rational, legitimate, and even serves compelling interest in ensuring that the services are safe and efficacious. For the district court to conclude otherwise, we contend was error. The district court's analysis on the equal protection clause, the ACA, and the Medicaid Act were all in error for that reason. And I'd like to start where the district court started, with the equal protection issues. The equal protection issues, as the district court addressed them, were addressed before this court decided Agnes Tucker. And the district court's analysis said that intermediate scrutiny applies, and then the district court went on to lay out its analysis. The district court also then said that the State's approach would fail the rational basis test. We believe that's wrong for a few reasons. Number one, if we're looking at the statute and we're applying the equal protection framework, we can break it down into, well, is the statute facially discriminating based on some kind of protected status? Number two, is that rare case where it's so obvious that the diagnosis is simply a proxy for discriminating against some kind of suspect class or quasi-suspect class? And number three, if this is the case where Arlington Heights applies to assess whether or not there was some kind of invidious discrimination against a suspect or quasi-suspect class, did the district court go through that analysis? Can I ask you a question sort of about the relevance of purpose or intentional discrimination? We have issued questions for purposes of the argument. What is your understanding of how sort of purpose works in equal protection challenges? So, for instance, the district court says at page 38, the rule and statute at issue were motivated in substantial part by the plainly illegitimate purposes of disapproving transgender status, so on and so forth. This was purposeful discrimination against transgenders. So is it your contention, A, that that was clearly erroneous, or B, that it doesn't matter because even if there is a finding of intentional discrimination, that still only gets you the level of scrutiny that you would otherwise get with respect to the class? Here, transgender individuals, and I guess your contention is they're not a quasi-suspect class, so we're in rational basis anyway. Which of those two is your position, or maybe both? It's both. It's yes to both. And if we take the second one first, the fact that transgender individuals are not a suspect class or quasi-suspect class is something that's important because at the end of the day, as we lay out in our supplemental briefs, the example of the judges, if at the end of the day you go through an analysis and you believe that the pretext about telling judges to retire based on age was because you wanted to take out rural judges, if that was your true purpose, that simply doesn't matter at the end of the day because we're looking at purpose to decide whether or not the government made a classification that's antithetical to our constitutional traditions. And the rural distinction is not one that's a quasi-suspect class. So then the question becomes, okay, is transgender such a quasi-suspect class that should be protected, or is it closer to the rural point? And our contention is that transgenders are not a quasi-suspect class for a few reasons. One, the Supreme Court has never recognized it. Two, this court in both Adams and in Eckness-Tucker said we have grave doubts about that. Three, even if you look at the record in this case, the record in this case does not establish that transgender individuals are a quasi-suspect class. If you work through the Caroline products factors, so to speak, do you acknowledge that some of them would cut toward finding that transgender individuals might be a suspect class or a quasi-suspect class? For instance, historically subject to discrimination? Your Honor, if the records show that they were historically subject to discrimination, then yes, that would cut in their favor. But the record does not show that in this case. And I think that's an important point. The record shows that if we work through the Caroline products factors, and Judge Sutton did this in his Scarametti opinion, and the record in this case is very clear, when it comes to mutability, we know that transgender status is not an immutable characteristic like race. It's a mutable characteristic. Yeah, I tend to agree with you that that factor, especially on the record in this case, cuts in your favor. I just want to make sure that we're all being sort of completely honest if we're going to work through this multi-factor analysis, that there might be pieces of it that cut in both directions. My own sense is that immutability, given the record in this case, cuts in your favor. Political powerlessness, I think, perhaps most importantly, in this case, cuts in your favor. But historically subject to discrimination, I think, might run the other way. And the relevance of the characteristic to one's ability to contribute to society, I think, certainly cuts the other way. Fair enough, Your Honor. In the abstract, they may cut in the other way. But again, where in the record does it establish that it cuts the other way? And I think that's important because they had an opportunity to put this material into evidence of trial. Wait, wait a minute. They had to put evidence into the record that transgender people can contribute to society? No. Pardon me, Your Honor. My point is this, that if the idea is that transgender individuals are being historically discriminated against, that historical discrimination analysis could have come in through trial. If we have an Arlington Heights case, it's not uncommon, for example, to have some kind of historian on the stand talking about sort of the historical advantages that someone has been subjected to. That didn't happen here. If we're talking about the transgender individuals' contributions to society that have been stopped, abated, or somehow trampled upon because of state action, historically, that is material that could have been put into evidence, but it wasn't. Is there authority that says there has to be evidence put into the record about historical record of discrimination? Well, Your Honor, I think if we're going to recognize a new quasi-suspect class, then yes, it would have to be something that's put into the record. Because if we're doing something and recognizing a new quasi-suspect class, which hasn't been recognized by the Supreme Court in 50 or so years... Okay, but you don't have any authority that says it can't be. The Supreme Court has not done it, but... The Supreme Court has not... You have no authority saying that the plaintiffs have to come forward with evidence of historical discrimination, do you? Your Honor, my contention is they would have to. I know what your contention is, but you don't have any authority to say that. I don't have any precedent on point establishing that, Your Honor. I would simply note that, again, if we're going to recognize a new quasi-suspect class for the first time in 50 years, there should be record evidence to establish the need to recognize a new quasi-suspect class for the first time in 50 years, and we just don't have that here. And I think that's something that cuts against them. So let's assume for a second that transgender individuals are a quasi-suspect class, and let's assume for a second that we have to go through the Arlington Heights framework to assess whether or not this quasi-suspect class has been the subject of invidious discrimination in this instance. We don't have that analysis in the underlying district court order. We didn't have anyone go through the Arlington Heights factors. We didn't have anyone talk about the presumption of good faith and whether or not that's been overcome. We have statements, especially with regard to the statute that was challenged, statements from four legislators out of a 160 member body of the Florida legislature, and we're saying that those four statements taken in isolation show that the entire legislature was intent on discriminating against individuals. So does that, this sort of goes, I guess, to the second branch, or maybe it was really the first branch of my sort of which is your position question, the sort of clear error with respect to district courts. I mean, it is just sort of like this one statement in the opinion, and is your point now that there simply isn't record evidence to support the finding that there was purposeful discrimination against transgenders, and if so, does that mean that that statement is clearly erroneous, or that that finding is clearly erroneous, or that it's unsupported in a way that would require a remand for a sort of a redo of Arlington Heights? It's an error for two reasons. Number one, the court, as we lay out in our briefs, didn't apply the presumption to give faith, which would be a legal error. Number two, the court's conclusion is clearly erroneous, because when you look at the evidence at trial, the evidence at trial was scant. Remember, they chose to challenge the statute by amending their complaint in the middle of trial. They didn't ask for more discovery. They didn't ask to put more record evidence in. They chose to roll the dice and have a trial go this way, where they amended the pleadings in the middle and challenged it, and had scant evidence to support their conclusion. Now, the United States Army said there should be a remand for this reason. We strongly disagree. There shouldn't be a mulligan to correct their trial strategy, which turned out to be a mistake in hindsight. I want to, before your time elapses, I want to ask you a question based on the Medicaid Act. First, let me ask you a factual question. If a cisgender female patient had high testosterone and that resulted in some male-associated characteristics, would Florida Medicaid pay for hormone treatments for that patient? Yes, Your Honor. Is that in the record someplace, or something like that? I may have said that as a colloquy with Judge Hinkle during the conclusion. Okay, but that's your position. On appeal, you don't argue that any of the district courts, at least that I saw, any of the district courts' findings of fact on whether treatment is medically necessary or experimental were clearly erroneous, did you? Your Honor, we don't say that it's clearly erroneous. We take a slightly different tact on it. In the Medicaid claim, we make the point that under the Medicaid Act, if you read it, it talks about reasonableness. If you read the leading Supreme Court case on it, Beal v. Doe, it talks about how that reasonable standard requires broad discretion to the state. And then when you take a look at Rush v. Parnum, Rush v. Parnum says, look, because Rush didn't happen in isolation, it was interpreting Beal. And Rush is saying that at trial, you, the state, can put forward new evidence. So it's not like a Chenery problem where the state is relegated to whatever rationales it gave earlier. And to me, if you take the text of the Medicaid Act, Beal and its discussion of broad discretion, and Rush, where Rush is saying we can come forward with new evidence a la rational basis type of argument, it is an exceedingly deferential standard to the state. And so our point is that the court erred by not having that deferential standard apply. The court used WPATH as the yardstick on pages 16 and 18 of the order. Then the court on page 45 says, well, you know, WPATH, kind of a biased organization. And on page 41, the court talks about the state's legitimate reasons in ensuring fertility, sexuality, preventing misdiagnosis, et cetera. So our contention is that all of that is a mixed bag of legal errors. Well, but, okay, I agree with you that there's a reasonableness legal question here. But the district court has to make findings of fact. And I think Rush supports this when it says we'd have to remand for fact findings. The district court makes findings of fact on medical necessity. Is this expert more credible than that expert? Is it experimental? Isn't that right? And those underlie the legal issue of whether it's reasonable. That's right, Your Honor. However, I would note that if what the state is doing is rational, then it is also reasonable, because the same underlying principles apply, where what the state is doing doesn't need to be correct for purposes of rational basis review or the Rush reasonableness test. If what the state is doing is picking a choice from the available set of choices, what the district court on page 41 acknowledges the state is doing because of legitimate concerns, then that is something that's already in Judge Hinkle's order. And it does not require a remand back down to him to make separate findings when we can come to that same conclusion. Your Honor, I see I'm going way over my time. Thank you. You've saved your full three minutes for revital. Mr. Gonzalez-Pagan. Good morning, Your Honors. I may please the court. Omar Gonzalez-Pagan for the plaintiffs. Your Honors, after a seven-day comprehensive trial, the court found that this exclusion both under the rule and the statute violate not just the 14th Amendment, but two different statutes, the Medicaid Act, both its EPSDT requirement and its comparability requirement. The comparability requirement prohibits discrimination on the basis of diagnoses. And my brother on the other side already stated that this very rule and statute discriminates on that basis. That alone is enough for us to succeed on that claim and for this court to affirm the district court's decision. In line with that... Can I ask you a quick question about just about the comparability requirement? Does the RUSH reasonableness analysis apply to that as well as the other Medicaid statute, the acronym of which I can never quite remember? EPSDT. Yes, Your Honor. We agree that RUSH B-PARM affects both Medicaid Act claims and that the question is whether determination by the state was reasonable. We disagree with the state that reasonableness review is one that is the same as rational, ordinary rational basis review. It is not. There is ample case law, including this court's own cases in Moore, in Garrido, that recognizes that there is judicial scrutiny that must be paid, must be made in determining whether a determination is reasonable. Whereas Moore, deference is not abdication. The state is asking for absolute deference here. Well, I'm not sure. I mean, in fairness, I'm not really sure that they're asking for absolute deference. They're asking for deference, to be sure. And, you know, any test that sets up as a reasonableness analysis does suggest a certain amount of leeway. I don't think they're asking for a blank check. They're just asking for, you know, sort of ordinary deference, it sounds to me. And you might not love the analysis to rational basis, but I'm not sure it's that far off. I don't agree with how ordinary rational basis would apply here. We would have to take us through even speculation by the state. And reasonableness is based on current medical opinion, as dictated by Rashmi Parham over 40 years ago. And that is ultimately what the court did here. It went through an extensive trial where it heard from multiple experts, found the plaintiff's experts to be found at least one of the state's experts to be entirely not credible, and only credited the state's experts to the extent it was consistent with the court's factual findings. So your position is it's not reasonable just because some evidence might support the other side, the state? I think the state has the burden, just we have the burden to show that it was not reasonable. We met that burden through our evidence that was credible or found to be credible by the district court. As counsel for the other side already conceded, they're not disputing that under the clear error standard, any of the factual findings by the district court. So how does that work? How do the findings, in fact, work with the reasonableness analysis? Can you explain that further? The reasonableness standard, we would concede that it's an ultimate question of fact of law. The court will answer. But the factual underpinnings leading to the district court's determination about reasonableness are purely factual findings that are subject to clear error review. The trial went through extensive factual findings with regards to the risk that exists with regards to these procedures, risks that exist for both cisgender and transgender people. It went through extensive factual findings as to the existence of clinical practice guidelines, their use by other medical organizations, and acceptability within the medical community in the United States. I guess my question is, I think the state's going to say, well, there's some evidence going the other way, right, that it's not medically necessary. So that makes the state's position reasonable. Tell me with citation to authority why that's wrong. Your Honor, I would point that, particularly more in this case, this court indicated that the state is not the final arbiter about medical necessity, that ultimately this is a determination that can come to the courts under the reasonableness standard. Davis v. Shaw, out of the Second Circuit, noted that deference is limited by the requirement that a state's determination bears some genuine relation to the beneficiary's medical needs. But I guess Judge Pryor's question is, if there's a mix of evidence, some of which goes this way, some of which goes this way, under a reasonableness analysis, why isn't the state, in effect, entitled to the benefit of the doubt? I don't mean to put words in her mouth, but maybe that's my recharacterization of her question. I accept your friendly amendment. I appreciate your recharacterization. What I would just say, Your Honor, that the existence of introduction of evidence at the end of the day is insufficient when that said evidence is not credible, when said evidence has not been credited by the district court. Just because the state put on an expert, one of whom referred to transgender people as diabolical, is not the existence of evidence on the other side. Okay, but the district court didn't find all the evidence not credible. The district court found what it thought to be the weight of the evidence in favor of medical necessity. But it's not like there was no evidence on the other side. There was no expert. Correct. But some of the arguments, for example, as a quality of evidence, pertain to whether most of the state and their briefs all point to, well, this is low quality evidence. That's their opening on their opening brief. Well, only 13.5 percent of all medical interventions have high quality evidence. And that low quality... It's unreasonable to expect that this treatment require a higher standard. So the low quality, doesn't that just pertain to whether or not there were actual clinical trials? Correct. It pertains to the quality of the studies based on the study design. And many things can't be tested in clinical trials. Is that your point? That's correct, Your Honor. So at the end of the day, they might have made arguments about the evidence. They might have introduced... Well, there are risks. Well, those risks exist both for these procedures, for both cisgender and transgender people. Some of the risks that they point to are in common, regardless of the medical condition being treated. There are side effects. So as I understand the scheme, the state is allowed to define medical necessity. Right. Well, it created a definition. So presumably it has to apply its own definition. Is that right? That's correct, Your Honor. So it can't just come in and make up some new definition of medical necessity. I think that's true, Your Honor. That would go to the use of the gap and standard factors, all of which the evidence shows that even under the state's own regulations, their determination was unreasonable. There's presence of clinical practice guidelines. There's published studies showing effectiveness. There is clear undisputed factual findings that as to these plaintiffs, these treatments were effective and helpful and ultimately medically necessary. Can I ask you... I know that you're short on time and I suspect that my questions may carry you over, which is fine. But a couple of equal protection questions. One, do you have a different view from your colleague on the other side about the relevance of purposeful discrimination? I mean, does evidence of purpose, discriminatory purpose, can it elevate the standard of review or does it really just kind of get you what it gets you? Thank you, Your Honor. And yes, as to that point, we definitely have a different point of view. I would point to our supplemental brief in that regard. But at the end of the day, there's a long history of case lists from the Supreme Court that recognize that when there is purposeful invidious discrimination, particularly as to an unpopular group, and I think we cannot bury our hands in the sand and say that transgender people, particularly in this day and age... So fine, but I think we might be conflating two different issues. I mean, so I tend to agree with you that the Supreme Court has emphasized the importance of purposeful discrimination for equal protection purposes, but I think it has emphasized it as a necessary component of any equal protection claim that's not based on the face of the statute, right? If you can show facial discrimination, you're good to go. If you can't, if it's facially neutral, then you're going to have to show purposeful discrimination. But either of those two things only gets you the standard of scrutiny that you're otherwise going to get for the class of people you're talking about. So, for instance, if there is evidence of purposeful discrimination against blondes, we're not going to intermediate scrutiny just because there was evidence of purposeful discrimination. You've got to ask whether blondes are a quasi-suspect class, right? So isn't that, aren't we really kind of, doesn't the analysis here really bottom on whether transgender individuals are or are not a suspect or quasi-suspect class? And the whole purposeful discrimination thing just kind of bleeds out of the case almost. I would disagree with Your Honor that, particularly under Washington v. Davis, that purposeful invidious discrimination is a requirement whenever there is an argument that there's a non-facially, a non-facially classifying statute, that that is a requirement as to that. However, we would argue not only that that's true, but that evidence of purposeful discrimination in particular contexts, such as when there is an unpopular group that's being targeted, is evidence in itself to elevate the standard of review beyond mere standard economic rational basis. And is that, is that because like if you're, if you're in, if you're in rational basis land in kind of like a Klubern kind of way where it's like, whoa, the evidence of purpose is so awful that it can only be chalked up to naked animus, then we're going to kind of tweak the rational basis standard a little bit? Or do you think it actually like picks you up out of the rational basis bucket and puts you into the intermediate scrutiny bucket? We would argue that it picks it up, Your Honor, and, and, and, and rushes it up. And, and we, the court did not decide whether there's a quasi-suspect or suspect class to do so. I think an evidence of that is in order to, it picks it up and then you go for the justifications to see whether it can only be explained by fair desire to harm a particular group, right? That's what happened in United States v. Windsor. That's what happened in, in other statutes like Romer. That's what happened in Moreno. And at the end of the day, there has to be a more suspect eye placed to laws like this that target a particularly unpopular group for discrimination. But, but in that respect, I think, right, the, the evidence, the sort of the bad purpose evidence would have to be, it's not sort of like ordinary discriminatory purpose evidence. It's kind of like super-duper discriminatory purpose evidence that can be explained only as like raw, naked, hateful animus. I don't believe that it's that level of heightened, super-duper, in court's words, level of evidence. United States v. Windsor is a clear example of that. There, there was a more, the Supreme Court applied a more suspect level. It was an equal protection case, a level of review, even not finding sexual orientation for purposes of that case to be suspect or quasi-suspect class. And it went through all the justifications that the federal government there presented as to the Defense of Marriage Act. The same holds true in regards to Obergefell, granted that's a both fundamental and equal protection case. But it's not simply the fact that there is nothing but a bare desire to harm. The very fact that there is invidious discrimination then ratchets up the justifications and prevents absolute deference to the, to the, to the state's justification. But, but, but surely not for every plaintiff, right? So like you, you, you, surely you agree with me about blondes, right? It doesn't matter how horrible the evidence of discriminatory purpose is, you're never getting them out of the rational basis bucket, right? I understand, Your Honor, and I think the words that I've used is particularly unpopular group. Yeah, and I guess I'm wondering, and I, I'm so sorry that I'm stuck. I hate to say that, but I'm sorry. Yeah, I should say bald people. But yes, so, so in, in that case, I guess what you're saying is you don't, you don't need to show that they are a quasi-suspect class. If they are unpopular, sort of short of suspect, then they get the benefit of this rule, this. Yes, Your Honor, and we can call it intermediate scrutiny minus, rational basis plus, rational basis with by the number of cases. Yeah. And we try to pretend that the levels of scrutiny are hard and fast and fixed and mechanical, and they're not. And I think at the end of the day, this is the type of law that is looked at with a more suspect eye. It is clear, I would argue that this is not a law that applies equally to everyone, and even if it did, it doesn't matter. But at the end of the day, it is clear that this is a law that affects only transgender people. Can I ask, sorry, can I, can I ask your permission to ask one more? So I'm so sorry, then I promise I'm going to leave you alone. I just find this difficult, frankly. Like, if we were to march through the Caroline products analysis to try to figure out whether transgender individuals were, are a suspect class, which I know your position is, you might, you might say we don't really have to get there, but if we get there, then your answer is yes, they are, correct? Absolutely. So, but do you, just as I was asking your colleague on the other side, are you willing to admit that a couple of these go the other way? You know, like ability to contribute to society, I think, frankly, kind of cuts your way. Historical discrimination probably cuts your way. But on the record, in this case, immutability, I think, you know, we've got testimony that the characteristic is not immutable, that, you know, people transition and detransition. And then also, with respect to political powerlessness, which it seems like has been sort of, to the extent there is, like, a main factor in the Caroline product analysis, it seems to be that. And do you think there is a good case to be made that transgender individuals are politically powerless? I think that's a hard case for you to make. Your Honor, so as to the four factors, I would point, I agree that we've described questions that we did not show a history of discrimination with specific evidence. No case has ever done that, nor was that done when race was adopted as a suspect class or sex. But for what it's worth, we have multiple exhibits on that point. Exhibits 75, 76, 131, all of which would show a history of discrimination. We also have a testimony as to ability to contribute, Your Honor. Well, I mean, I think, look, I think those two, again, I think they kind of cut your way. I'm interested in your reaction to the other two. Yes, Your Honor. I would say that those two that I just went through are the most important ones as recognized by United States v. Winstead in the Second Circuit. As to political power, Your Honor, I would just have to disagree. I don't believe that there's a hard case to make that transgender people are politically not powerful. Even you think relative to the percentage, the raw percentage in society? I don't believe that that was ever the case, Your Honor, that political power is calculated based on how much, the raw percentage of people. But isn't that, I mean, that's not a crazy way to think about it, is it? Your Honor, there are less than 1% of people that identify as transgender as found by the district court. And while we do have evidence of, and this court can take judicial notice of, is the very clear reality, and it's articulated on pages 12 and 13 of our brief, that just in the last two years, this state alone has adopted over half a dozen statutes targeting transgender people for disparate treatment in some form. Whether it's in health care, whether it's in schools, whether it's on their ability to use the restroom, whether it's whether they can use their pronouns in employment. All of that is happening in this state right now, and they were not able to stop it. And I think it just behooves common sense to say that in this day and age, starting here today, that transgender people are somehow politically powerful. It's political attack after political attack, both in this state and nationally. And so, okay, so that's, I'm trying to figure out sort of what the relevant geographic unit is. Because I think, like, what someone might say in response is, yes, but look at the administration's Title IX regs. The U.S. is on your side in this case. Fourteen states are on your side in this case, you know. And so, from a nationwide perspective, I think someone could reasonably say relative to the less than 1% sort of overall population, they have outsized political influence. Your women have made up a majority of the population for a long time. If they were not recognized as a suspect class until Craig B. Boren in 1976, by then there were already federal statutes, statutes that protected them, including Title VII. So, the idea that there are some measures that have been passed that extend protections to people doesn't negate the fact that they are politically powerless as a group. The fact that people may have some allies doesn't mean that they're politically powerless as a group. And so, I would just posit that, Your Honor. Briefly, as to the second factor, and I know that I'm delaying. It's my fault, not yours. Your Honor, I would just posit that this Court doesn't need to find immutability. The actual test is whether there's a sufficient distinguishing characteristic or immutability. And here, there is a sufficiently distinguishing characteristic. For what it's worth, alienage and legitimacy, both, as I suspect, classes, are clearly not  half of the classes that are subject to heightened scrutiny are not based on immutability at all. And so, that is not the arbiter, certainly not the sole arbiter, as to whether transgender people are subject to quasi-suspect or suspect treatment. With that, Your Honor, I ask that the Court please affirm either on either of the statutory grounds or under any of the multiple theories we've presented on federal equal protection. Thank you. We've taken you way over your time, and we appreciate your answering our questions. Ms. Baldwin. Good morning, Your Honors, and may it please the Court. Anna Baldwin for the United States of Zemeckis. I'd like to focus my time, you know, in addition to any of the Court's questions, just on the comparability provision. And the District Court correctly held, based on the extensive trial record, categorically barring coverage for individuals based on a diagnosis for care that would be otherwise allowable violates the comparability clause. And that holding is consistent with every circuit precedent on point. The Fourth Circuit, just this year, also held en banc that West Virginia's similar categorical coverage exclusion violates the comparability provision of the Medicaid Act. That holding is consistent with the Eighth Circuit's longstanding precedent, going all the way back to 1980, that Iowa's exclusion of gender-affirming care violated the Medicaid Act's comparability requirement. So in looking at this, you know, Judge Perry, you're asking, you know, the reasonableness test. Is that, you know, a legal question, a factual question? And, you know, I agree with my colleague that it is, of course, a mixed question of fact and law. But I disagree with my colleague on the other side of the aisle that it's the same thing as rational basis review. It's not. The whole point of the comparability provision is that there are some reasons that are off the table. You cannot discriminate based on diagnosis. So under an example of rational basis, the state could always say, well, look, you know, we're going to protect the FISC and we're going to save money by not offering this care. That is off the table for comparability. Instead, it is based on if the care is otherwise allowable, you can't discriminate based on diagnosis. Can I ask you a quick question? And feel free to tell me if I've got this wrong. But I thought that I had read this pre-split Fifth Circuit case called Curtis. To hold that you can't discriminate solely on the basis of diagnosis. But here, even if some of the discrimination is based on diagnosis, isn't some of it also maybe based on experimental status? So, yes, Your Honor. So that, you know, that's Florida's argument here is that it has to be otherwise. You can't discriminate based on diagnosis where it's otherwise allowable. And Florida's argument is it's not otherwise allowable because it's not medically necessary. It's experimental. And that is where you get into the court's, this court's clear holding is the reasonableness determination. It's not solely up to Florida. Medical necessity is not just based on what they say. The court gets to take a real look at the record. But so, just so I'm clear, does that mean, and I asked the other, I asked someone this earlier. But so, does that mean that the Rush analysis, the reasonableness of the determination of experimental status applies both to the five-letter acronym claim and to the comparability claim? Yes. Okay, got it. So the underlying, it has to be, you know, meet the test for medical necessity. And that's going to be an underlying element for both. And, you know, as Judge Pryor was asking earlier, you asked, you know, counsel, where is the clear error in any of the factual findings? And the state hasn't identified any clear error in any of the factual findings. And you have important... And if reasonable, the reasonable test here were akin to rational basis, you would just toss out all that evidence, right? Because you would say the state could rationally have thought that this wasn't medically necessary. And that's not what, that's not the test we apply. And that's not the test that we apply. And it's also not the test, even if it were some more kind of reasonable weighing the evidence test, you know, hypothetically how that might work. But that's not this record. You have in this record, the court finding that the record includes no evidence that these treatments have caused substantial adverse clinical results and properly for the patients. And what's important to keep in mind is a lot of the arguments about risk and, you know, things, they're based on risk for adolescence. And again, there's, the court made very clear findings on that. But this is across the lifespan ban that bars coverage for adults too. And there is just absolutely no record evidence that would suggest that these treatments are experimental for adults. In fact, as the district court found, these are some of them going to be the only treatments that effectively address gender dysphoria for, you know, the scope of someone's lifetime. So that really distinguishes this case from some of the other equal protection cases that are going on where it's really based on what's the standard of review. This is a record-based case where you have excessive factual findings saying, this is the widely accepted standard of care. Florida challenges none of those findings. So when you get to, was this a reasonable determination, where it's a mixed question of fact and law, you simply can't show error where you can't show underlying error. What's your best authority that supports that reading of how we apply reasonableness? I think the best authority would be, you know, Moore v. Reese, Rush v. Parham, and, you know, the Fourth Circuit's en banc decision in Cadell, you know, which also relies on the Second Circuit's decision in Davis that says you can't apply the comparability test so broadly that you can say these treatments that are otherwise allowable for every other condition, they just aren't appropriate for this condition. That kind of reasoning, which is Florida's reasoning, would swallow the comparability test whole. Thank you. Thank you, Your Honor. We ask that the Court affirm and could do so solely on the basis of the comparability claim without need to reach any of the other claims in the case. Your Honor, I'd like to pick up where my friends left off with the Medicaid claims. Everyone agrees that the Rush v. Parham test is what applies. Here's a broad concern with the Rush v. Parham test. At the end of the day, the district court applied that test in such a way that it required the state to pick the objectively right conclusion that the district court sought based on the evidence. And that's just not what Rush v. Parham requires when read together with Beal. And you don't need to overturn the district court's factual findings because some of them actually support the conclusion that it was appropriate for the state to do what it did. And there, I commend to the Court's consideration, page 43 of the district court's order, where the district court goes through the state's very legitimate concerns in bone density, fertility, sexuality, misdiagnosis, the need for multidisciplinary teams to make these diagnoses, not hypnotists or interns, and concerns about cognition. And, Your Honors, I commend to the Court's consideration the state's catalog of WPATH and Endocrine Society standards on page 16 of our brief going down that talk about what WPATH and the Endocrine Society say are ongoing concerns about how these things work. And taken as a whole, that then means that it was reasonable for the state, in an ongoing medical debate that's going on nationwide and worldwide, to pick one of two camps. It was not unreasonable, even though the district court thought, based on the district court's review of the evidence, that one might be right. The fact that it is an ongoing debate, that there are legitimate concerns, and the state picked one of the two options, is reasonable. And that is the only way to read that, because otherwise, we would be taking the broad discretion language from Beal and throwing that out the window and saying that the state needs to pick the one objectively right answer based on the trial. Your Honor, my friends also continue citing, as the district court did, 42 CFR 440.230B, which talks about Medicaid-eligible patient services being made available solely because of diagnosis, type of illness, or condition. What the district court and my friends leave off in their briefs is that that section starts out with the state cannot arbitrarily make these distinctions. Now, think about that for a second. That is why the state can say, we will cover breast augmentation surgery for a woman who's going through cancer, and say that the state will not cover breast augmentation for a woman who is doing it for cosmetic reasons. That's why that arbitrary language... But that's not medically necessary in your second example. Yes, Your Honor, it's not medically necessary, but it's still... The point I'm trying to make, Your Honor, and perhaps this is an inarticulate example, is that there is an arbitrary component in that CFR provision. In the comparability analysis. And then when we look one section up in subsection B, there's also reasonableness components. The reasonableness, arbitrariness are built into the CFRs that are implementing this, which again is consistent with Beal and the other cases. Your Honor, I see I'm out of time. We would ask you to reverse, and for the record, Judge, using my like how you comb your hair. Thank you to all counsel. Move to our next case on...